UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 12-60049-CR-ROSENBAUM/MATTHEWMAN

UNITED STATES OF AMERICA,

        Plaintiff,

v.

ROGERIO CHAVES SCOTTON,
a/k/a Roger Scotton,

        Defendant.
_____/

**ORDER ON DEFENDANT'S MOTION TO OBJECT [ECF NO. 364]**

This matter is before this Court on Defendant Rogerio Chaves Scotton's "Motion to Object Rights to Subpoena Under F.R. Cr. 17(B)" [ECF No. 364] ("Motion to Object"). The Court has carefully reviewed Defendant's Motion and has considered fully the record in this case. For the reasons set forth below, the Court now denies Defendant's Motion to Object.

In his Motion to Object, Scotton poses a number of objections to the proceedings in this case. The Court addresses each objection in turn. Before doing so, however, the Court notes that throughout the proceedings in this matter, Defendant has engaged in a pattern of conduct that appears designed to attempt to create error in the record. Moreover, after participating in such behavior, Defendant has consistently tried to benefit from his wrongful conduct, claiming that his own actions that he knowingly undertook in violation of this Court's rules, the Federal Rules of Criminal Procedure, and the Federal Rules of Evidence have unfairly prejudiced him. And, while Defendant feigns ignorance of the rules, the record plainly belies his contentions and shows that Defendant fully

knows what he is doing and that he has purposely flouted the rules in an elaborate effort to benefit from his own misconduct. In addition, Defendant has repeatedly attempted to delay the proceedings in this case by any means possible, and the pending Motion appears to be the latest in Defendant's multiple efforts to avoid having the jury reach a verdict in this case. This Court will not countenance such behavior.

**1. The Court's Declination to Authorize Certain Subpoenas Requested by Defendant**

Defendant has sought to call numerous witnesses in his defense. In response to Defendant's requests, this Court has held numerous *ex parte* hearings in an effort to ascertain whether the various witnesses' presence is necessary "for an adequate defense" under Rule 17(b), Fed. R. Crim. P., and the Court has authorized the issuance of several subpoenas that Defendant has sought. *See, e.g.,* ECF Nos. 141, 147, 150, 165, 222, 230, 263, 284, 285, 288, 299, 300, 303, 338, 346, 349, 353, 355, 359, 360, 362, 363. It is true that the Court has declined to issue some subpoenas that Defendant has sought. But those requested subpoenas fail to satisfy Rule 17(b)'s requirement that the witnesses whose testimony they would seek to procure is necessary for an adequate defense.

On the record during the *ex parte* hearings, this Court has fully explained its bases for denying the issuance of such subpoenas and will not belabor the record by repeating its explanations here, except to note that, for the most part, the denied subpoenas pertain to witnesses whose anticipated testimony, as described by Defendant, fails to meet the standard of relevancy, is cumulative, involves only inadmissible evidence such as hearsay and double and triple hearsay with no applicable exception, or suffers from some combination of these defects. Despite denying these requests, however, afer learning more about the matters at issue during the Government's presentation of its case at trial, the Court has continued to authorize the issuance of subpoenas and

attendance fees for more than twenty witnesses.

### 2. Alleged Fabrication of Document

Next, Defendant asserts that the Government has engaged in "outrageous misconduct and fabricated document and now even lie in Court to judge and jury . . . ." ECF No. 364 at 2. Based on events that have occurred during trial so far, the Court infers that Defendant is referring to a draft letter that United States Customs and Immigration Services Senior Adjudicator Fred Brooks prepared, declining to adjust Defendant's immigration status. During Defendant's pretrial-detention hearing in this case, the Government provided Defendant with a copy of his Alien File, which included this draft letter, which was never sent to Defendant and is addressed to Defendant at an address where Defendant never lived. Because Defendant never received this letter and it is addressed to him at a place where he never lived, Defendant insists that this letter was "fabricated" by the Government.

First, the Court notes that the Government never presented this draft letter at trial. Nevertheless, Defendant had an opportunity to fully question Senior Adjudicator Brooks about the draft letter. Brooks testified that he had prepared the draft letter because he had conducted the interview of Defendant and his alleged wife Ailyn Mollinedo to determine whether Defendant's immigration status should be adjusted, and he had concluded that it should not be adjusted because he did not believe the legitimacy of the marriage. Since conducting the interview, however, Brooks had moved to a new position while Defendant's application was pending and before USCIS issued its decision to Defendant. Therefore, Brooks did not issue or sign the final letter. Instead, he merely prepared a draft letter summarizing his findings and provided it to the adjustor who issued the final letter. Brooks further explained that the draft letter bore an incorrect address because he used what

he described as a template, or a previously used similar letter to another individual, to prepare the draft letter, and he never changed the address from the template to reflect Defendant's correct address since it was only a draft and was meant to convey only his reasoning to the subsequent adjustor.

Nothing about this evidence indicates to the Court in any way that the Government "fabricated" evidence in this case. And, while the Court would not tolerate fabrication of evidence under any circumstances, the Court further notes that here, the allegedly "fabricated" evidence does not even really bear on whether Defendant did or did not make false statements to USCIS, as charged in the Second Superseding Indictment.

The only other allegedly "fabricated" evidence that the Court can discern that Defendant posits exists relates to an undercover video recording made by Federal Bureau of Investigation Special Agent Roy Van Brunt of a meeting between himself, acting in an undercover capacity as an employee of DHL Express, and Defendant. Throughout this litigation, Defendant has insisted that the Government tampered with the video recording, claiming that a woman he has known since she was a little girl came up to Defendant and Agent Van Brunt during the recording and greeted Defendant, even though no record of such an event exists on the recording.

Based on Defendant's allegations, the Court authorized payment of an expert to examine the recording to determine whether it had been tampered with. Defendant's expert concluded that absolutely no evidence of tampering existed. Despite Defendant's expert's unqualified opinion, Defendant attempted to suggest to this Court that Defendant's expert had reached the opposite determination. Thereafter, he requested a subpoena for the woman who allegedly greeted him in the middle of the meeting with Agent Van Brunt, claiming that she could testify that she had interrupted

that particular meeting. Indeed, Defendant asserted that the Court-appointed investigator, Ms. Martinez, had interviewed the woman and that she would testify as Defendant had represented. The woman is a member of the United States Coast Guard, who is stationed in North Carolina. Therefore, the Court asked Ms. Martinez whether Defendant had accurately summarized her interview with the woman. Ms. Martinez explained that, while the woman remembered seeing and greeting Defendant at some point in South Florida, she could not recall who, if anyone, was with Defendant. Accordingly, she could not present evidence tending to show that the video recording had been fabricated.

Moreover, the Government provided Defendant with an audio recording of the same meeting, which was made simultaneously with the video recording. Defendant has been able to point to no inconsistencies between the audio and video recordings that would support the conclusion that the Government fabricated the video recording. Thus, no basis for excluding evidence or sanctioning the Government for alleged fabrication of evidence exists.

**3. The Court's Instructions to the Jury Regarding Defendant's Conduct During Trial**

Defendant also asserts that the Court's instructions to the jury have prevented Defendant from being able to obtain a fair trial. The Court believes that Defendant is referring to two instructions that the Court has given.

First, despite this Court's repeated and detailed warnings to Defendant that he could not testify unless he took the witness stand and testified under oath, Defendant continued throughout the trial to persist in attempting to testify in the guise of purporting to ask questions of witnesses. As the court explained to Defendant on numerous occasions, Defendant has a constitutional right not to testify, and, should he choose to exercise that right, his decision not to testify may not be held

against him. But, should he decide not to testify, he may not attempt to introduce what would otherwise be his testimony during opening statement, closing argument, or questioning of witnesses. In other words, Defendant may not have it both ways; he may not both effectively testify through his opening statement, questioning of other witnesses, and closing statement and simultaneously shield himself from cross examination by refusing to take the stand and testify under oath. Despite these clear instructions, Defendant blatantly violated the Court's directives and repeatedly attempted to have the jury hear Defendant's side of the story through his questions and opening statement.

The Court further advised Defendant that his conduct required the Court to explain to the jury that Defendant had a Fifth Amendment right not to testify and that if he chose not to testify, that fact could not be used against him. But if he wished to testify, he had to do so from the witness stand, under oath, and nothing that he said in any other capacity constitutes evidence. Defendant nevertheless continued to engage in his improper attempts to have the jury consider his statements without taking the witness stand. As a result, the Court instructed the jury as set forth above. After doing so, the Court specifically asked the jury whether it understood the instruction and whether it could follow it. The jury indicated that it did and it could. Nothing about the Court's correct statement of the law to the jury — necessitated by Defendant's own knowing and violative conduct — is error. *See United States v. LaChance*, 817 F.2d 1491, 1496-97 (11th Cir. 1987). Accordingly, the court declines to grant Defendant's request for a mistrial.

The second instruction that the Court gave and that the Court believes Defendant contests regards the Court's instruction to the jury following Defendant's attempts to make the Court complicit in Defendant's efforts to mislead the jury into believing that evidence that does not exist in fact exists. In this regard, during the testimony of Ailyn Reyes, Defendant's alleged wife,

Defendant attempted to impeach Reyes's testimony that her marriage to Defendant was a sham by suggesting that he had a video recording of himself engaged in sexual relations with Reyes. Towards this end, when Reyes denied that she had had sex with Defendant, Defendant asked the Court for permission to show an alleged video recording of himself having sexual intercourse with Reyes.

Previously, however, the Court had specifically scheduled a pretrial hearing at which the Court explained that it would consider whether such a recording would properly be admitted as impeachment evidence. Despite the Court's scheduling of more than one hearing to consider the alleged recording, Defendant was never able to produce it. Therefore, the Court called Defendant sidebar when he asked for permission during Reyes's testimony to show the alleged recording. At that time, Defendant insisted that he had the recording, that he had played it for his investigator, Ms. Martinez, and that she would vouch for its existence. During a subsequent recess, Defendant repeated his contentions in the presence of Ms. Martinez and the Government. Ms. Martinez then expressly denied that she had seen the alleged video recording, stating that Defendant had played something on his computer for her but had specifically instructed Ms. Martinez to avert her eyes while the recording played. Thus, Ms. Martinez had not seen any alleged recording of Defendant and Reyes engaged in sexual relations because Defendant himself had ensured that she would not. Nor was Defendant otherwise able to provide a copy of the alleged recording to the Court.

Based on this sequence of events, the Court was concerned that Defendant had created the impression that such a recording existed and that the Court had previously reviewed it. Because the Court refuses to be complicit in any party's attempt to mislead the jury, the Court instructed the jury that it was concerned that the jury might have developed the impression, based on the proceedings involving Reyes, that the Court had reviewed a video recording of Defendant and Reyes involved

in sexual relations and that the Court needed to make the jury aware that it had reviewed no such recording, and, at that time, that no evidence of such a recording existed in the trial record.[1] Such an instruction was not error and does not provide the basis for a mistrial.

### 4. Court's Alleged "Hostile and I[na]ppropriate Racism Against the Defendant"

Without any evidence whatsoever, Defendant accuses the Court of engaging in "hostile and i[na]ppropropriate racism against the Defendant." ECF No. 364 at 2. Of course, any racism by anyone associated with the Court, including me, would be outrageous, unacceptable, and indefensible, and it would certainly provide a basis for disqualification. But Defendant has cited absolutely no evidence to support his outrageous allegation, and I expressly deny any racism.

Defendant's baseless accusation of racism appears to be a part of his strategy to disrupt the proceedings, this being the second time that he has hurled such an unsupported allegation at a judge assigned to this case. *See, e.g.*, ECF Nos. 220 at 18; 234; *see also* ECF Nos. 261, 280 (denying Defendant's motions). Defendant's unwarranted accusations of racism, however, cannot create a basis for disqualification of the judge, as they provide no grounds for finding that the judge's "impartiality might reasonably be questioned" or that she "has a personal bias or prejudice" against Defendant. *See* 28 U.S.C. § 455(a), (b)(1).

### 5. The Court's Comments About Defendant's Improper Conduct During Trial

Defendant complains that the Court has remarked about Defendant's less-than-forthright conduct before the Court during the course of the proceedings in this case and particularly during

---

[1] As of this time, the Court remains unaware of any evidence of the existence of any such recording. The Court further notes that Reyes specifically denied engaging in sexual relations with Defendant and asserted that no recording of such an occurrence could exist in view of the fact that she had never had sex with Defendant.

the trial. Based on the Court's comments, Defendant contends that I should be disqualified from the case for bias and prejudice. ECF No. 364 at 3-7.

Two statutes pertain to the recusal of a federal district judge: 28 U.S.C. § 144 and 28 U.S.C. § 455. *Hamm v. Members of the Bd. of Regents of the State of Fla.*, 708 F.2d 647, 651 (11th Cir. 1983). Section 144 governs when a party timely files a sufficient affidavit demonstrating that the presiding judge has a "personal bias or prejudice either against him or in favor of any adverse party . . . ." 28 U.S.C. § 144. In such a case, the party seeking disqualification must file an affidavit specifying the "facts and the reasons for the belief that bias or prejudice exists" at least ten days before the proceeding, and it must be accompanied by a certificate stating that the affidavit is made in good faith. Here, Defendant has filed no such affidavit or certification, and he has raised the issue three weeks into trial.

Therefore, the Court considers Section 455. As noted previously, Section 455 sets forth a general rule requiring a judge to "disqualify [herself] in any proceeding in which [her] impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Under this provision, as a general rule, "bias sufficient to disqualify a judge must stem from extrajudicial sources . . . and must be focused against a party to the proceeding." *Hamm*, 708 F.2d at 651 (citation omitted). In other words, any alleged bias must generally stem from "some basis other than what the judge learned from [her] participation in the case." *Jaffe v. Grant*, 793 F.2d 1182, 1188-89 (11th Cir. 1986) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966) (quotation marks omitted). The sole exception to this general rule occurs when the record demonstrates "such pervasive bias and prejudice . . . as would constitute bias against a party." *Id.* (citation and quotation marks omitted). But "[m]ere 'friction between the court and counsel" does not demonstrate "pervasive bias." *Thomas v. Tenneco*

*Packaging Co., Inc.*, 293 F.3d 1306, 1329 (11th Cir. 2002) (quoting *Hamm*, 708 F.2d at 651). Nor do a "judge's comments on lack of evidence," the "origin of frivolous arguments the court had witnessed," or a judge's stated conclusion that a party had engaged in a proceeding "primarily for delay" satisfy the required showing. *See Hamm*, 708 F.2d at 651; *Deems v. Comm'r*, 426 F. App'x 839, 843 (11th Cir. 2011); *Thomas*, 293 F.3d at 1329-30; *Brookshire v. Comm'r*, 452 F. App'x 901, 904 (11th Cir. 2012).

Here, no basis for disqualification exists. As the record demonstrates, all comments about which Defendant complains occurred outside the hearing of the jury and were based entirely on Defendant's conduct during the litigation of this case. In addition to the episodes of Defendant's behavior recounted above in this Order, Defendant engaged in abundant other improper conduct. Among numerous other examples of such behavior, the Court recounts just a few that caused the Court to find it necessary to advise Defendant during trial and after he committed the violations previously discussed, that the Court was aware of Defendant's efforts to mislead the Court and the jury and to manipulate and delay the process and attempt to purposely introduce error and that it would not stand for such conduct.

For example, as this Court has recounted previously in detail, *see, e.g.*, ECF No. 148; *see also* ECF Nos. 93, 99, 116, 182, 282, Defendant has been through multiple attorneys in this case, including three that the Court appointed for him at Court expense. Defendant was abusive and hostile towards all of them, suing and otherwise threatening one of them and threatening to sue another for $10 million. Moreover, Defendant engaged in this conduct, despite this Court's explicit warnings to Defendant that he had an obligation to cooperate in his own defense and that if he refused to do so, the Court would have no choice but to require him to represent himself. Still,

Defendant chose to obstruct his relationship with his various attorneys. And, although the Court further cautioned Defendant every time that a new attorney had to be appointed that appointment of a new attorney would delay trial because new counsel would require time to learn the case and prepare for trial, Defendant continued to fire his attorneys and refuse to cooperate with them.

Then, when the Court had no alternative but to conclude that Defendant had waived his right to counsel under *United States v. Garey*, 540 F.3d 1253 (11th Cir. 2008) (*en banc*), Defendant requested multiple continuances of trial. Each time, the Court explained to Defendant that it could grant the extensions, but doing so at Defendant's request would not result in a Speedy Trial Act violation or in the granting of bond. Despite the Court's explanations, Defendant insisted on multiple trial continuances over the Government's objections. He then filed several almost identical, frivolous motions to dismiss the case for alleged violations of the Speedy Trial Act. *See, e.g.,* ECF Nos. 92, 98, 106, 109, 115, 118, 122, 123, 124, 125, 142, 181, 206.

Defendant has also repeatedly insisted that the Government and his prior attorneys destroyed evidence in this case. But, in accusing the Government of such destruction, Defendant points in particular to a letter allegedly written by Osvani Duarte — a letter that Defendant still possesses and that he has submitted to the Court, thus conclusively demonstrating that it has not been destroyed. As for his former attorneys' alleged destruction of evidence, This Court heard testimony from two of Defendant's prior attorneys and one investigator — all of whom testified that they had not destroyed any evidence and that they had attempted to review the evidence with Defendant, but he refused to participate. Moreover, in the presence of the Court, prior defense counsel turned over all evidence to Defendant, and then the Government also replicated its prior production of discovery. In addition, this Court set a subsequent *ex parte* hearing at Defendant's request and required that the

attorney whom Defendant accused of destroying his evidence be present. *See* ECF No. 306. When defense counsel appeared for the hearing, Defendant declined to ask him a single question.

Similarly, during the course of trial, Defendant accused the Government of failing to produce documents that it offered in discovery. But each time, the Government was able to produce copies of letters or filings demonstrating conclusively that the Government had, in fact, produced — often times more than once — the evidence that Defendant alleged the Government had not produced.[2]

Nor did Defendant's difficult conduct end before trial began. During the course of the trial, in addition to the obstructionist instances described elsewhere in this Order, Defendant repeatedly called for sidebar conferences for no reason other than to complain about the Court's rulings, even though the Court instructed Defendant that requesting sidebars for this purpose was improper and unfairly wasted the jury's time. Yet Defendant continued to persist in such conduct. Based on Defendant's refusal to follow the Court's clear and repeatedly provided instructions, it seemed to the Court that Defendant was attempting to bait the Court into precluding Defendant from participating in sidebar conferences so that he could either blurt out inappropriate remarks in front of the jury, on the basis that the Court had refused to allow Defendant to have sidebar conferences, or so that he could have an alleged error to appeal. Therefore, the Court had to continue to put up with Defendant's senseless requests for sidebar conferences.

Also during the trial, Defendant attempted to sneak inadmissible documents into evidence by hiding them among the pages of admissible documents. In this regard, Defendant sought to introduce evidence that the Government was separately able to authenticate, but when the

---

[2]Defendant also alleged that the Government intimidated his mother. Following a hearing on Defendant's accusations, Judge Matthewman found Defendant's contentions to be entirely baseless. *See* ECF No. 294.

Government asked to review the document immediately before Defendant attempted to use it during the trial, the Government discovered that Defendant had interspersed among the exhibit other documents from a different source, having nothing to do with the first document. It goes without saying that such conduct is inappropriate, impermissible, and underhanded.

In light of Defendant's conduct before and during trial, the Court's remarks to Defendant were proper and appropriate and stemmed solely from the Court's observations of Defendant's behavior during the course of this case. The Court has an obligation to maintain control of the proceedings and to conduct a trial that is fair to all. *See Moore v. United States*, 498 F.2d 439, 442-44 (5th Cir. 1979). Because of Defendant's repeated abuses of the process, the Court's efforts to stem such continued shenanigans by advising Defendant that the Court was aware of what Defendant was doing and that it would not tolerate such behavior was warranted.

### 6. Defendant's Outburst in Front of Juror Number 6

At the beginning of the trial, Juror Number 6 advised the Court that her significant other worked for Citrix, one of the companies whose account was allegedly compromised by Defendant. After the parties and the Court followed up with the Juror, the Court was able to determine that the Juror could sit fairly on the case and not allow the fact that her significant other worked for Citrix to affect her weighing of the evidence, as Citrix suffered no losses in the case.

While the Court was examining Juror Number 6 to ensure that she could continue to serve as a juror in the case, Defendant interrupted and blurted out that he wanted to strike the Juror. The Court had not asked for Defendant's opinion at that time, and the Court had recently finished conducting *voir dire*, so Defendant knew full well that he would have an opportunity to seek to strike the Juror outside the Juror's presence. Nevertheless, Defendant screamed out that he wished to strike

her.

The Juror responded by indicating that she was fearful of Defendant now that he had sought to strike her in her presence and that she did not wish to continue on the jury. Following additional questioning and explanation by the Court, the Juror indicated that she could focus on the evidence and would try in good faith to decide the case based only on the evidence. She further agreed to remain on the jury and to advise the Court at the end of the trial if she could not be fair to Defendant or if she would be influenced by anything other than the evidence in deciding the case. Finally, Juror Number 6 agreed not to discuss her feelings with anyone else, including the other jurors.

Defendant sought at that time to strike the Juror based on the Juror's expression of fear, which Defendant himself induced by seeking to strike the Juror in her presence when he knew full well that he was not to make any such motion while any jurors were in the room. The Court denied Defendant's Motion, explaining to Defendant that the Juror would remain on the jury until the case concluded, and the Court would consider striking her before deliberations if she could not demonstrate that she could decide the case based solely on the evidence.

The Court has carefully observed Juror Number 6 since that time, and she has scrupulously paid attention to the proceedings, taking notes and observing all of the evidence presented. In addition, the Court has seen Juror Number 6 act in a relaxed manner, smiling and interacting pleasantly with the other jurors. At this time, more than three weeks after Juror Number 6 expressed her initial concerns, it does not appear that Juror Number 6 fears Defendant or is otherwise unable to render a verdict based solely on the evidence in the case. But the Court will inquire again of Juror Number 6 before the Court sends Juror Number 6 to deliberate.

For all of the foregoing reasons, Defendant Rogerio Chaves Scotton's "Motion to Object

Rights to Subpoena Under F.R. Cr. 17(B)" [ECF No. 364] is **DENIED.**

**DONE and ORDERED** in Fort Lauderdale, Florida, this 18th day of February 2014.

_____
ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE

copies:

The Honorable William Matthewman

Counsel of Record

Jason Kreiss

Rogerio Scotton
Reg: 99370-004
F.D.C. Miami
P.O. Box 019120
Miami, Florida 33701