UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 12-60049-CR-ROSENBAUM/MATTHEWMAN

UNITED STATES OF AMERICA,

        Plaintiff,

v.

ROGERIO CHAVES SCOTTON,
a/k/a Roger Scotton,

        Defendant.
_____/

## ORDER ON DEFENDANT'S MOTION FOR NEW TRIAL [ECF NO. 389]

This matter is before this Court on Defendant Rogerio Chaves Scotton's Motion for New Trial [ECF No. 389]. In his Motion for New Trial, Scotton seeks a new trial based on eight alleged errors: (1) issues relating to the immunity that the Government bestowed on Defendant's wife, Ailyn Mollinedo Reyes; (2) the Court's decision not to allow Scotton to call some of the witnesses he desired to call; (3) immunity allegedly provided by the Government to Renata Moreira and Carla Fellini; (4) the Court's limitation of Elane Costa's testimony to preclude her from testifying about fraud in which family members of Carla Fellini had allegedly engaged; (5) a general allegation that the Court "stopped being an impartial arbiter of the proceeding [and became] actively involved in advising the Government to 'fix' various situation[s] that arose throughout the trial;" (6) the Government's alleged alteration of Government Exhibit 204; (7) the Court's alleged dismissal of an unidentified juror without Defendant having been provided with an opportunity to object; and (8) the Government's alleged intimidation of defense witnesses. All of Defendant's objections are

devoid of merit.

### *1. Immunity for Ailyn Mollinedo Reyes*

Defendant complains that the prosecutor "perjury herself to the Court when she object Defendant during cross examination wife Ailyn and told the Court, in front the jury, and everyone, that the Government had not offered an immunity to the witness."[1] [*sic*]. ECF No. 389 at 3. Defendant further alleges that "the Court . . . erred when it instructed the Assistant United States Attorney . . . to 'fix the problem with the jury.'" The Court disagrees with Defendant's recollection of the facts and concludes that no error occurred.

Here's what actually happened: Defendant asked Ailyn Mollinedo Reyes whether she had immunity, and the Government objected without further comment. At no point in front of the jury did the Government state the basis for her objection.

The Court then called the parties up for a sidebar, and the Government initially indicated that it did not view a letter that it had sent to Reyes as providing immunity, presumably meaning that the letter did not confer official immunity pursuant to 18 U.S.C. §§ 6001-6003.[2] After the Court reviewed the letter and opined that it was "fairly construed" as providing a form of immunity, the Court allowed Defendant to inquire of Reyes regarding immunity. Reyes insisted that she had not been granted immunity.

Then the Government conducted its redirect of Reyes. When the Government announced

---

[1] The Court construes Defendant's suggestion that the prosecutor "perjur[ed] herself" as an allegation that the prosecutor lied. The prosecutor was never under oath, and thus, could not have perjured herself.

[2] The Government had provided the letter to Defendant as early Jencks material, which is how Defendant knew of the letter.

that it had concluded its redirect, the Court called the parties sidebar and instructed the Government, "I think you have to find a way to correct the immunity problem, . . . and now would be the time to do it." In other words, the Court instructed the prosecutor to make it clear to the jury that Reyes, contrary to her testimony when Defendant questioned her, was, in fact, provided with a form of immunity. The Court did this to protect Defendant's rights and ensure that the jury was not misled either by the Government's initial objection to Defendant's questioning of Reyes regarding immunity or by Reyes's repeated denials that she had been given immunity. When Defendant raised other matters, the Court explained, "What [the prosecutor is] going to do now is clear up on the record that there was immunity [given to Reyes]."

The Government then attempted to obtain Reyes's admission that the Government had given her immunity, but Reyes steadfastly denied that she had received immunity. So the Government asked Reyes, "Well, if I tell you that we did tell you that [truthful testimony would not result in any criminal exposure to you], do you remember that?" Defendant objected that the prosecutor was leading the witness. Therefore, the Court explained,

> She's trying to clear up the record so the jury will know that she has given immunity for her testimony so it would be fair to you. If you don't want her to do that, that's your choice. What she's trying to do is make it clear on the record that, as you suggested in cross-examination, she's provided immunity for her testimony. If you don't want her to do it, that's fine. But this is the only way that she can probably ask it. I leave it to you. Do you want her to ask it or not?

In response, Defendant withdrew his objection, and the prosecutor again attempted to obtain Reyes's acknowledgment that the Government had given her immunity:

> Q:   When you met with us, throughout the time we have met with you, we have always told you, tell the truth, if you tell the truth, everything will be okay, correct?

>   A:   Yes.
>
>   Q:   And if I tell you that we also told you that as long as you tell the truth, there won't be any criminal consequences to you -- let me rephrase that. Strike that. If I tell you that we told you, as long as you tell the truth, there will be no criminal consequences, you don't have any reason to doubt that? You may not remember it, but we did tell it to you?
>
>   A:   I don't understand the question.
>
>   Q:   If I tell you that the government told you that as long as you testified truthfully and were truthful and honest with the government, nothing -- there would be no criminal prosecution, nothing, no criminal exposure for you, correct?
>
>   A:   No, they never told me that.
>
>   Q:   Is it possible that you just don't remember that, that was told and you just don't remember?
>
>   A:   No, they never told me anything about that.

Defendant again objected, and the Government excused the witness and the Court instructed the Government to offer a stipulation regarding the immunity. The prosecutor then stated in open court, "The parties stipulate that the government told Ms. Reyes that truthful testimony would not result in any criminal exposure."

    This was an accurate characterization of the contents of the letter that the Government had previously provided to Reyes and Defendant. At no time in front of the jury did the Government deny that it had bestowed immunity on Reyes or otherwise attempt to mislead the jury. To the contrary, after the matter was brought to the Government's attention, the Government repeatedly attempted to point out to the jury that it had, in fact, granted Reyes a form of immunity. So, as the record demonstrates, Defendant's objections regarding Reyes's immunity are meritless.

### *2. The Court's Decision Not to Allow Scotton to Call Certain Witnesses*

Defendant challenges the Court's decision not to permit him to call all forty witnesses that he desired to call. According to Defendant, "the 29 witness [sic] that would have testified would have impeached the Government witnesses and further testified to actual innocence." ECF No. 389 at 5. Defendant's contention in this regard belies the record.

Rule 611(a), Fed. R. Evid., commands the Court to "exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment." Each of the Court's decisions not to permit the testimony of a witness were guided by these considerations.

The Court held a number of extended *ex parte* hearings with Defendant in which Defendant requested that certain witnesses be subpoenaed and permitted to testify. While the Court will not set forth its analysis behind each decision, a few points and examples warrant mention.

First, the Court authorized service of far in excess of eleven subpoenas. As the Court repeatedly instructed Defendant, it was his job to obtain correct addresses for witnesses for whom the Court authorized service of subpoenas. Because Defendant failed to obtain accurate addresses for several witnesses, the Marshals Service was unable to serve some of the subpoenas that the Court authorized.

Moreover, when Defendant became aware that a witness allegedly intended not to comply with her subpoena, the Court offered to contact her by telephone to facilitate her appearance at trial. Despite the Court's repeated requests for contact information for the witness, however, Defendant never provided it.

Second, as characterized by Defendant, the content of the testimony of many of the witnesses who Defendant sought to present was cumulative. For example, Defendant sought to present multiple character witnesses. Although the Court authorized the presentation of four character witnesses, the Court drew the line there.

Third, with respect to some of Defendant's proposed witnesses, Defendant could not describe any testimony that would have been relevant to any of the issues pending before the Court. For example, Defendant asked that Erica Rands be permitted to testify. As Defendant explained her expected testimony, Rands would have testified that she saw Defendant at the time that Defendant was meeting with Agent Van Brunt, who was acting in an undercover capacity and was recording the meeting. Because Rands does not appear in the recording, Defendant claimed, the recording had been tampered with. In fact, however, Rands advised Defendant's investigator that, although she had met with Defendant at some point, she could not say when it was, and she did not remember whether Defendant was with anyone at the time.[3] Thus, the Court declined to authorize the expenditure of monies for Rands, who lives in North Carolina and is a member of the United States Coast Guard, to travel to Fort Lauderdale to testify for Defendant.

Likewise, Defendant sought to recall Reyes and Fellini, although he had an extensive opportunity to cross-examine them when the Government called them as witnesses. Because Defendant sought to recall them, the Court directed Defendant to explain what relevant and non-repetitive areas of inquiry he intended to pursue. Defendant never identified any.

Fourth, as the Court discovered during the trial, many of the witnesses who Defendant

---

[3] In addition, the Court authorized the expenditure of monies so Defendant could have an expert examine the recording for tampering. Defendant's expert concluded that no evidence of tampering with the video existed.

presented did not, in fact, testify even remotely the way that Defendant had suggested that they would.  For example, during an *ex parte* hearing, Defendant requested that both Robert Kravitz and Genilde Guerra be permitted to testify.  As he explained their testimony, Defendant stated that they were law partners who had advised Defendant with regard to immigration (though not with regard to the immigration application charged in the Indictment), and, thus, Defendant intended to rely on their testimony to present an advice-of-counsel defense.  Because Defendant could not explain what unique knowledge one attorney had that the other did not, the Court authorized Defendant to call one of the two to testify.  Defendant chose to call Guerra.

When Guerra testified, however, she stated that she was a corporate and real-estate lawyer and did not practice immigration law.  She further noted that, although Defendant was a client of her law firm, he was actually a client of her partner, Robert Kravitz.  Guerra explained that she had had nothing to do with Defendant's legal work and that she did not know anything about it.[4]

Similarly, during an *ex parte* hearing, Defendant described Francisco Cavalcante as someone who had met Osvaine Duarte — the person Defendant blames for having committed the offenses charged to Defendant — and had done business with Duarte.  Defendant further claimed that Cavalcante had stayed at Defendant's home for two weeks in August 2011 and could testify that Reyes was living there at that time.  During trial, however, Cavalcante gave no testimony indicating

---

[4]Although the Court explained the advice-of-counsel defense to Defendant on multiple occasions and Defendant stated that he wished to call witnesses to allow him to rely on it, in fact, he did exactly the opposite.  During the testimony of Rihab Hamade, the attorney who handled Defendant's immigration application to adjust his status, which was charged in the Indictment, the Court again explained the advice-of-counsel defense to Defendant, providing him with the Eleventh Circuit Pattern Jury Instruction on the defense.  At that time, Defendant specifically declined to present the evidence required to prove an advice-of-counsel defense.  In particular, Defendant chose not to waive his attorney-client privilege with respect to Hamade to allow her to testify to what Defendant had told her.

that Duarte had committed any of the offenses charged to Defendant, and Cavalcante denied ever having met Reyes during his stay with Defendant in 2011, which Cavalcante described as having lasted three to four days at most.

The testimony of Cheryl Mulet, Robert Saint George, Gizane Vidal, Michael Peters, David Conklin, Adria Worthington, and Shawn Bombaro likewise bore little, if any, resemblance to Defendant's description of what their testimony would be.

Finally, near the end of Defendant's case, the Court asked Defendant to call his next witness. At that time, Defendant declined to call anyone further, stating that no other witnesses were present.

In short, Defendant received every opportunity to call any and all relevant witnesses, and no new trial will be granted on this basis.

### *3. Immunity Allegedly Provided by the Government to Renata Moreira and Carla Fellini*

Defendant contends that the Government bestowed immunity on Renata Moreira and Carla Fellini and that the prosecutor misled the jury by not disclosing this alleged fact. He bases this contention on Agent Van Brunt's testimony regarding the Government's letter of immunity provided to Reyes. In describing this letter, Agent Van Brunt opined that it said nothing more than what he tells every witness and then elaborated on what that was: it is important to tell the truth while on the witness stand, so you will not have to worry about prosecution for perjury. While this characterization of the contents of the letter that the prosecutor provided to Reyes certainly reflects a misunderstanding of the letter's contents, it does not provide evidence that the Government actually conferred any type of immunity on any witness other than Reyes. Nor is there any other evidence that the Government granted any other witness any form of immunity.

And neither Moreira nor Fellini — nor any other witness, for that matter — testified to any

crime that might have supported the provision of some form of immunity. While Defendant alleged that Moreira herself had entered into a sham marriage, Moreira steadfastly denied that she had done so. As for Fellini, Defendant claimed that her family — not Fellini — had engaged in some type of fraud related to properties that they owned, giving Fellini immunity would have done nothing to assist her family.

Finally, the Government expressly denied having provided any witness other than Reyes with immunity. And the Court is aware of no evidence supporting Defendant's claim that the Government immunized any witnesses in any way other than Reyes. As a result, Defendant's objection is overruled.

### *4. The Limitation of Elane Costa's Testimony*

During the trial, Defendant attempted to elicit from Elane Costa that Carla Fellini's family had engaged in some type of property fraud. According to Defendant, such testimony was relevant to demonstrate that Carla Fellini had perjured herself in order to obtain immunity for her family members' alleged property fraud. The Court declined to permit the testimony.

First, whether Carla Fellini's family members may have committed some type of property fraud is not relevant to any issue in Defendant's case.

Second, Carla Fellini, not her family members, testified. As Defendant explained Costa's anticipated testimony, Costa would have opined that Fellini's family members were involved in some type of property fraud. Whether Fellini's family members did or did not participate in property fraud does not bear on Fellini's credibility. Nor — even if they did engage in property fraud — does that circumstance make it any more or less likely that the Government offered Fellini immunity for her family members if she testified against Defendant. No evidence whatsoever exists that Fellini

was offered any type of immunity — whether for herself or for her family — in exchange for her testimony. Indeed, the record is devoid of any evidence that the Government had any knowledge of any alleged property fraud committed by Fellini's family. For these reasons, not permitting Costa to testify regarding Fellini's family's alleged property fraud was not error.

### 5. *Defendant's Contention That the Court Abandoned Its Role as an Impartial Arbiter*

Defendant alleges generally that "many times during the trial . . . the Court stopped being an impartial arbiter of the proceeding . . . [and became] actively involved in advising the Government to "fix" various situation [sic] that arose throughout the trial." ECF No. 389 at 8. But Defendant points to no specific incident where he claims that this occurred other than those addressed elsewhere in this Order. Nor has the Court been able to identify any part of the proceedings where the Court engaged in such behavior. Accordingly, this objection is overruled.

### 6. *The Government's Alleged Alteration of Government Exhibit 204*

Defendant asserts that the Court "fail [sic] to stop the trial . . . when it was demo[n]strated that [the prosecutor] has committed fraud on the Court when she admitted an altered immigration document as evidence and did not notify the jury that such document has been altered to remove exculpatory information." ECF No. 389 at 9-10. This is a misleading and dishonest portrayal of what actually occurred.

In reality, before the Government presented Government Exhibits 204 and 205, it brought to Defendant and the Court's attention that Question 38 on the form asked whether Defendant had ever been arrested, and on Exhibit 205, Defendant had responded that he had. Because that response was irrelevant to the charges at issue in the Indictment and the Government recognized that it might be prejudicial to Defendant, the Government offered to redact the question and answer from Exhibit

205. Exhibit 204 was a different application by Defendant on the same form. Although Defendant did not answer Question 38 affirmatively on Exhibit 204, the Government offered to redact the question and answer on that exhibit as well because not doing so would reveal what had been redacted on Exhibit 205.

In response to the Government's offer, Defendant indicated his desire that the two exhibits be redacted. Therefore, they were.

Obviously, the Court and Defendant were both well aware of the fact that Exhibits 204 and 205 had been redacted at the time that they were admitted. Defendant, of course, did not object to the redaction at the time that the exhibits were entered into evidence. Indeed, the redaction was done for his benefit in accordance with his desires. And, obviously, it would have been improper for the Government to draw the jury's attention to the fact that it had redacted Question 38 from Exhibits 204 and 205 at Defendant's request. Neither the Government nor the Court did anything improper in connection with the Government's use of the redacted versions of Exhibits 204 and 205.

But Defendant did. During closing, he held up the second page of Exhibit 204 and stated, "They present this document to you guys, right? It's in evidence. You want to talk about fabrication? The whole 38 section is missing out of this document." This argument was entirely improper and dishonest. Defendant's attempt to revive this inappropriate argument as a basis for a new trial is equally so.

### *7. The Court's Alleged Dismissal of an Unidentified Juror*

Defendant complains that the Court dismissed a juror without giving Defendant the right to object. Only a single juror was dismissed after the jury was impaneled in this case. After that juror learned that immigration charges pending against Defendant related to an alleged sham marriage that

Defendant had entered, the juror alerted the Court that she could not follow the law on the immigration charges because she strongly disagreed with it. The Court attempted to rehabilitate the juror, but she refused to agree that she would follow the Court's instructions on the law as it related to the immigration charges. Under these circumstances, the juror was properly dismissed. *United States v. Polar*, 369 F.3d 1248, 1253 (11th Cir. 2004) (citation omitted).

### *8. The Government's Alleged Intimidation of Witnesses*

Finally, Defendant accuses the Government of "intimidation to [sic] Defendant [sic] witnesses, one in particular [—] Mr. Wolf from New York that had confess [sic] received call from Agent Van Brunt and cause [sic] not even to remember file [sic] police report against Osvaine Duarte that has [sic] used his company [sic] FedEx account to ship[] over 25 thousand in box to Brazil." ECF No. 389 at 10-11. The record in this case, however, is completely devoid of any evidence that the Government intimidated anyone.

Evidence that the Government intimidated Ron Wolf in particular is equally lacking. Defendant provided the Government with a police report that Wolf had filed years earlier with a police department in Georgia. That document indicated that Wolf had reported that Duarte had used Wolf's company's FedEx account to fraudulently ship items.

After Wolf was served, he went to Costa Rica, and it was not clear whether he intended to comply with the subpoena. Therefore, at Defendant's request, the Government called Wolf to facilitate his appearance during trial. At that time, Wolf claimed that he remembered nothing about the Duarte incident because his business ships thousands of items and has done so for years, and his business often must deal with incidents of fraud. During the hearing, Wolf stated that Agent Van Brunt had contacted him to ask him about the contents of the police report that Defendant had

previously provided to the Government.  According to Wolf, Wolf advised Van Brunt of the same thing that he told the Court — that he had no recollection of the Duarte report.  At no point did Wolf say anything that even remotely suggested that the Government had attempted to intimidate him or otherwise affect his testimony, despite the fact that the Court gave Defendant an opportunity to ask Wolf anything he wished.  Because no evidence exists that the Government intimidated any witnesses — including Wolf, this basis for a new trial must also be denied.

For the foregoing reasons, Defendant's Motion for New Trial [ECF No. 389] is **DENIED**.

**DONE and ORDERED** in Fort Lauderdale, Florida, this 18th day of March 2014.

_____
ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE

copies:

The Honorable William Matthewman

Counsel of Record

Jason Kreiss

Rogerio Scotton
Reg: 99370-004
F.D.C. Miami
P.O. Box 019120
Miami, Florida 33701